UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| RHONDA ELLIOTT | § | |
| | § | |
| Plaintiff, | § | CASE NO. 7:18-CV-237 |
| | § | |
| vs. | § | |
| | § | |
| INTREPID DIRECTIONAL DRILLING SPECIALISTS, LTD. | § § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF RHONDA ELLIOTT'S ORIGINAL COMPLAINT

The plaintiff, Rhonda Elliott, complains of the defendant, Intrepid Directional Drilling Specialists, Ltd., and for cause of action would show the Court as follows:

### I. INTRODUCTION

1. Rhonda Elliott, a female who was 45 years old at the time, was terminated as an employee of the defendant after asking for reasonable workplace accommodations during her treatment as a cancer patient. Despite her known disability, defendant unlawfully discriminated and retaliated against Rhonda Elliott. It is also alleged that defendant discriminated and retaliated against plaintiff based on her sex, her age, and with respect to her rate of pay vis-à-vis similarly situated male employees. This lawsuit accordingly seeks equitable relief, actual, compensatory, liquidated and punitive damages, attorney's fees, expert witness fees, taxable costs of court, and pre-judgment and post-judgment interest for violations of the Americans with Disabilities Act of 1990, Title VII, the Equal Pay Act, and the Age Discrimination in Employment Act of 1964

### II. PARTIES

2. Plaintiff Rhonda Elliott, resides in Midland, Midland County, Texas.

3. Defendant Intrepid Directional Drilling Specialists, Ltd., is a Texas limited partnership with its principal office in Midland, Midland County, Texas. It may be served with

process through its registered agent, Clint Leazer, at the following address: 10314 State Highway 191, Midland, Texas 79707.

### III. JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, the Americans with Disabilities Act of 1990, as amended ("ADA"), Title VII of the Civil Rights Act of 1964, as amended, The Age Discrimination in Employment Act of 1967, and the Equal Pay Act.

5. This court has personal jurisdiction over defendant because it conducts business within the Western District of Texas.

6. Venue of this proceeding is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(1)-(2) because defendant is a resident of this district for purposes of the general venue rule, and because this district is where a substantial part of the events or omissions giving rise to the pleaded claims occurred.

### IV. CONDITIONS PRECEDENT

7. Plaintiff filed a charge of discrimination against defendant with the Equal Employment Opportunity Commission ("EEOC") on March 12, 2018. The charge was assigned the following Charge Number: 451-2018-01696.

8. On September 24, 2018, the EEOC issued a Notice of Right to Sue, stating that "[t]he EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent." The Notice of Right to Sue referred to rights under "Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in

Employment Act."  The filing of this lawsuit is being accomplished within ninety (90) days of plaintiff's receipt of her Notice of Right to Sue.

9. All conditions precedent have been performed, have occurred, or have otherwise been satisfied as required by applicable law.

## V. FACTS

10. Rhonda Elliott ("Elliott" or "plaintiff") went to work as an employee of Intrepid Directional Drilling Specialists, Ltd. ("Intrepid" or "defendant") eleven years ago, in 2007.

11. In 2006 Elliott earned a Bachelor of Arts degree in accounting from the University of Texas Permian Basin.  Elliott worked for Intrepid in the accounting department when she was first hired.  As will be explained in greater detail below, Elliott eventually was Intrepid's only in-house accountant.  In addition to bookkeeping, preparing financial statements, and overseeing other aspect of Intrepid's accounting requirements, Elliott handled payroll, worked in human resources, and even served as Intrepid's receptionist when the need arose.

12. Elliott fought cancer the entire time she worked for Intrepid—from 2007 through January 2018 and continues her battle to the present date.  She was open with and informed Intrepid about her cancer since the beginning of her employment with Intrepid.  She originally was diagnosed with non-Hodgkin's lymphoma and with treatment went into remission, but the cancer came back in the form of cervical cancer in 2014.  Elliott's cancer and the treatments that were required to fight the cancer created a substantial limitation on major life activities for her, including walking, standing, lifting, bending, and even driving a car.  She had to attend therapy sessions, have chemotherapy treatments, and underwent several major surgeries.  As a consequence, she had to take time away from work to attend her treatments and surgeries, but continued to work and perform as a loyal employee for Intrepid.  Elliott was at all times able, with reasonable accommodation if

necessary, to perform the essential functions of her job.

13. In 2013, Intrepid's then-accountant, a male, was promoted to Vice President of Finance and Elliott was promoted to accountant. Elliot's predecessor earned more than $100,000 a year while serving Intrepid as an accountant, yet Elliott made far less money doing the same job. When Intrepid let the person doing payroll go, Elliott took over that responsibility as well. She was also working in human resources, which her predecessor never did. Elliott finally got a raise when, after Intrepid laid off the receptionist, Elliott took over the responsibilities of receptionist as well. She was then doing the job that Intrepid previously had five people doing, and being paid less than any of them had been paid.

14. When Elliott mentioned to her boss, Clint Leazer, that she was paid less than the previous accountant, she was told "it's fair because you're a woman, and you don't need the same pay as [your male predecessor] because your husband is the breadwinner in your household."

15. In May of 2016 Elliott had to have a full hysterectomy because she had a cancerous tumor the size of an orange. She had the hysterectomy on a Thursday, and came back to work on the following Monday, without a doctor's release. Her doctor's orders were to be off work for three weeks. During her time in the hospital, she was called and texted by Intrepid's managers and owners about work issues. Intrepid did, however, send her flowers.

16. After the hysterectomy, Elliott underwent chemotherapy treatments. She was undergoing chemotherapy treatments all the way through the end of her employment in early January of 2018.

17. Because of her cancer and the chemotherapy, Elliott fell at her home and injured her knee. This occurred in 2016. She tore her ACL and meniscus, and a cadaver ligament was surgically inserted in her knee. She wore a brace for months after the surgery. The brace extended

from her ankle to her thigh.  She had to go up and down stairs at work while using crutches.

18. She had her knee surgery on a Friday in November of 2016 so she could be back to work the following Monday.  If Elliott took any days off, she was told she would have to use vacation days and therefore not be paid.  Another male employee had knee replacement surgery that was less invasive than Elliott's surgery.  He was allowed a total of ten weeks off <u>with</u> <u>pay</u>.  He used no vacation.  He was paid his full salary and did not have to use short-term disability.

19. Immediately upon returning to work after the surgery, Elliott was required to climb the stairs while on crutches and in a full leg brace so that she could make tea for Clint Leazer, one of Intrepid's owners.  Elliott explained to Leazer that she could not move her leg and would need to be on crutches for twelve weeks.  Elliott pointed out that going up and down the stairs would potentially rip her stitches and not allow her leg, into which the cadaver ligament had been placed, to heal.  Leazer said he would try to limit the number of times Elliott would need to go up and down the stairs to once or twice a day—to get his tea.

20. Nothing, however, changed.  Elliott continued to be required to go upstairs more than once or twice every day to get Leazer's tea and bring it to his office.  None of the men who worked at Intrepid was ever asked to do this.  Leazer stated in front of other employees that it was a woman's job.  When Leazer needed his tea to be refilled he would text Elliott to come refill his tea.

21. Because Elliott's knee was not healing due to using the stairs and undergoing chemotherapy, Elliott approached Leazer several times about the possibility of not having to climb the stairs.  Leazer replied that special concessions could not be made for one person.  Elliott would leave work at least three times a week with no shoe on because her leg and foot were swollen from too much stair climbing.

22.     On the sixth week after her surgery, Elliott fell down the last three stair steps. Leazer and several other Intrepid employees came to check on her. Rather than showing sympathy, Leazer told Elliott she needed to be more careful.

23.     After twelve weeks, Elliott continued to wear the brace because the cadaver ligament was not attaching properly. She informed Leazer about this problem, and that she was going to physical therapy three times a week at 7:00 a.m. so that she would miss as little work as possible. Elliott's family members would drive her because she was unable to drive herself.

24.     Aware of Elliott's physical condition, when Intrepid held birthday celebrations at the office, Leazer required Elliott to get the cake for everyone, and then cut the cake. Leazer stated at the first birthday party, in front of all employees, that cutting the cake was a woman's job.

25.     Elliott went to Leazer and told him about sexual harassment from Intrepid's Vice President of Finance, and Elliott's supervisor. Leazer told Elliott that she was a beautiful and sexy woman and should be used to the treatment of her because "it is the oilfield." Elliott told Leazer that she was not comfortable with the situation. Leazer replied that there was nowhere else to place Elliott and that she would need to work things out with her supervisor.

26.     After the above-referenced discussion about her supervisor, things were fine for a while. But eventually her supervisor again said inappropriate things to Elliott. Elliott again informed Leazer of her supervisor's inappropriate conduct, and Leazer again told Elliott that her supervisor was her boss and that Elliott needed to be a "team player."

27.     All the women in Intrepid's office were told to dress professionally, while the men were allowed to wear jeans and T-shirts. The men were also allowed to come and go as they pleased. Elliott, on the other hand, was not allowed to leave for lunch until Intrepid hired another receptionist—one entire year after Elliott assumed receptionist duties. Intrepid had a different set

–6–

of norms for the men than for the women employees. The women had to clock in by a bathroom used only by men. The men left the door open while using the restroom so that the women could see and hear them. Elliott brought this issue up to her supervisor as well as to Tamara Scoggins and Randy McDonald, but no corrective action was taken.

28. None of the salaries at Intrepid between men and women were comparable. The men were paid more for the same or similar jobs.

29. When Intrepid moved into its new building there were no locks on the women's restroom. The door kept opening when women, including Elliott, would use the restroom. Elliott brought this up to her supervisor, who just laughed, along with Leazer, and said "boys will be boys." Elliott was using the restroom one day when someone opened the door and a remote control car sped around her feet. Elliott of course jumped up and screamed, causing urine to run down her legs. She had to go home and change clothes. That evening Elliott went to Lowe's and bought two locks for the women's restroom and installed them herself the next day.

30. During the downturn in the oil industry, all of Intrepid's female employees were laid off with the exception of Elliott. Elliott was then instructed to do all of the laid off employees' jobs with no extra compensation. She worked fifty to sixty hours a week and took payroll and anything else the owner wanted done home with her to finish. She was expected to answer calls 24 hours a day from the owner. Leazer texted and called Elliott at all hours of the day and night—when she was at the hospital receiving chemotherapy, and while she was on vacation.

31. Eventually, Intrepid hired Tamara Scoggins to supervise Elliott in Elliott's role as an accountant for Intrepid. Tamara Scoggins was 35 years old at the time.

32. In December of 2017, there was discussion by Intrepid managers and owners about moving the accounting department upstairs. Scoggins eventually confirmed the decision that she

–8–

and Elliott should move upstairs.  Leazer agreed.  Elliott expressed the concern that with her knee and other cancer related physical limitations it would be a problem for her to go up and down the stairs.  Scoggins responded by saying that the move upstairs was happening and that Elliott's job would be upstairs, or Elliott would not have a job.  Elliott sent her another text and an email to express her concerns.  Scoggins then told Elliott that Leazer wanted the men and women employees separated.  Elliott told Scoggins again both in person and through texts that Elliott would be happy to move anywhere downstairs, but that being moved upstairs was a problem.

33. Finally, after much bullying from Scoggins, Elliott said she would move upstairs, wear her brace, and make the best of the situation.  On January 4, 2018, Elliott was in her office and there were two other Intrepid employees joking with her about making a lift for the stairs and teasing Elliott about needing a hover board.  Scoggins came in visibly upset and told Elliott to "quit rallying the troops."  Elliott told Scoggins she was not "rallying the troops," and that the other employees were just joking with her.

34. The next day, at 5:00 p.m., Scoggins called Elliot into the Vice President's office and told her that she was being written up for causing drama.  Scoggins' written reprimand stated that Elliott denied "rallying the troops," but that Elliott had said she could "rally the troops" if she wanted to.  Elliott denied to both Scoggins and the Vice President that Elliott had said she could "rally the troops."  Elliott therefore refused to sign the reprimand because she believed it to be inaccurate.

35. Elliott became upset because of the inaccurate information contained in the written reprimand.  Elliott asked the Vice President to talk to the other employees to confirm that Elliott was not causing drama or other trouble.  Scoggins responded by telling Elliott there was no reason to get upset.  Elliott said there was a reason to be upset, namely, that she was being reprimanded

for something that did not happen. By this point, Elliott was crying and the Vice President said he would talk to the "guys" and that he and Elliott would talk more the next day. Elliott asked the Vice President if she could talk to him alone, to which Scoggins said "no," and that Elliott needed to leave.

36. The next day Elliott was off work because of a chemotherapy appointment. The Vice President and Scoggins texted Elliott and asked if she could come in and meet with them. Elliott told them she was ill from the chemotherapy and asked if the meeting could wait until Monday. They both said no and that Elliott needed to come in that afternoon. When Elliott walked into the Vice President's office she was fired from her employment with Intrepid. No reason was given. The date was January 5, 2018.

37. On January 5, 2018 and for the duration of Elliott's employment with Intrepid, Intrepid was aware of Elliott's cancer and cancer treatment, and the knee surgery that stemmed from her cancer. Elliott was undergoing chemotherapy when her employer terminated her. Intrepid regarded Elliott as having a disability, she had a record of disability, and Elliott had requested the accommodation of not having to work upstairs.

38. Elliott filed for unemployment compensation on January 7, 2018. On January 23, 2018, Intrepid's lawyer called Elliott and said Intrepid would not fight the unemployment if she would sign a release stating that she would not sue them. Elliott refused to sign a release. Intrepid then fought the unemployment compensation claim, alleging that Elliott raised her voice during the above-described reprimand. Elliott denied that she raised her voice, explaining that she was too busy crying.

39. There have been fistfights between male Intrepid employees and no one was reprimanded, or fired. There were male Intrepid employees cussing at each other and at Elliott and nothing was done.

40. Elliott was terminated by Intrepid because of her disability, sex, age, because she spoke out about sexual harassment in the workplace, and because she requested and was denied reasonable workplace accommodations for her disability. Intrepid has created and sustained a hostile work environment for Elliott.

41. Any and all conditions required for the maintenance of the suit have occurred, been performed, or are otherwise satisfied.

## VI. CAUSES OF ACTION

### COUNT ONE: DISABILITY DISCRIMINATION—ADA

42. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

43. Plaintiff is a qualified individual with a disability as defined in the Americans with Disabilities Act.

44. Defendant intentionally discriminated against plaintiff by, including but not limited to, issuing unwarranted discipline and terminating plaintiff's employment in violation of the Americans with Disabilities Act of 1990, as amended.

45. Plaintiff was disciplined and terminated on account of her disability and/or perceived disability.

46. Defendant also discriminated against the plaintiff by not making reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee.

47. Defendant's actions were in reckless disregard of plaintiff's rights.

48. As a direct and proximate result of defendant's unlawful discriminatory conduct, plaintiff has been injured and is entitled to judgment and compensation pursuant to the ADA.

## COUNT TWO: DISABILITY HARASSMENT—ADA

49. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

50. Plaintiff is a qualified individual with a disability as defined in the Americans with Disabilities Act. Plaintiff alleges that her employer harassed her because of her disability, and that she was subjected to a hostile work environment. Defendant's owners/managers unlawfully ordered plaintiff to perform demeaning tasks unrelated to her essential job functions, and in direct disregard of her physical limitations.

51. Defendant's actions were in reckless disregard of plaintiff's rights. Defendant failed to remediate known acts of harassment.

52. As a direct and proximate result of defendant's unlawful discriminatory conduct, plaintiff has been injured and is entitled to judgment and compensation pursuant to the ADA.

## COUNT THREE: DISABILITY RETALIATION—ADA

53. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

54. Plaintiff is a qualified individual with a disability as defined in the Americans with Disabilities Act. Plaintiff alleges that defendant retaliated against her because she took steps to enforce her lawful rights under federal law prohibiting discrimination based on disability in the workplace.

55. Plaintiff requested that the defendant reasonably accommodate her disability, including by placing her in a downstairs office, or by making existing facilities used by employees readily accessible to and usable by individuals with disabilities.

56. Defendant retaliated against the plaintiff because of her request for reasonable

accommodations, and because she expressed her dissatisfaction and otherwise opposed the defendant's refusal to provide her with reasonable workplace accommodations for her disability.

57. Defendant's actions were in reckless disregard of plaintiff's rights. Defendant failed to accommodate plaintiff's disability.

58. As a direct and proximate result of defendant's unlawful discriminatory conduct, plaintiff has been injured and is entitled to judgment and compensation pursuant to the ADA.

### COUNT FOUR: SEX DISCRIMINATION, HARASSMENT AND HOSTILE WORK ENVIRONMENT—TITLE VII

59. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

60. Plaintiff claims she was sexually harassed based on her sex by her supervisor and by Intrepid's owner and that Intrepid is responsible for the harassing conduct. Plaintiff was subjected to sexual harassment from her supervisor and the company's owner. She reported unwanted sexually suggestive statements that were made to her. The defendant's owner, Leazer, brushed off her complaints and told her to be a "team player" and just get along with her boss. By leaving plaintiff under the supervision of a reported sexual harasser, Leazer in effect engaged in an act of further sexual harassment against plaintiff and created a hostile work environment for plaintiff, in that the plaintiff has suffered continued anxiety and stress in having to work with the supervisor in the same environment.

61. Plaintiff was also in an environment where men would use the restroom leaving the door open for female employees to see and hear them using the toilet. Plaintiff could not use the female restroom without having the door opened repeatedly. When she reported it, she was told that "boys will be boys." She even had to endure a male employee sending a remote controlled toy into the restroom while she was urinating. Again, her complaints about this conduct were ignored.

62. The sexual harassment and hostile work environment was so pervasive at Intrepid that plaintiff was told by the company's owner that she should get used to it because she is a "beautiful and sexy woman" and, after all, she is working in the oil field.

63. As a result of the hostile work environment, plaintiff has sustained emotional and mental distress, anxiety, and other intangible damages.

64. Plaintiff's supervisors were aware of plaintiff's distress and her susceptibility to it, and they not only failed to address the hostile work environment in which plaintiff was placed but they were, in large measure, directly responsible for it.

65. Under the circumstances, defendant's actions were willful and malicious, entitling plaintiff to punitive damages.

## COUNT FIVE: RETALIATION FOR COMPLAINING
## ABOUT THE HARASSMENT AND HOSTILE WORK ENVIRONMENT

66. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

67. Plaintiff reported multiple instances of improper and sexually motivated discrimination and harassment engaged in by her supervisor, Babb, and by other Intrepid employees.

68. While defendant's owner placed the responsibility on plaintiff to be a team player and deal with the misconduct by just getting along, he also allegedly counseled Babb to refrain from engaging in inappropriate and sexually charged statement and innuendo. Babb refrained for a while, but eventually began his harassment again. Plaintiff reported Babb again, and also complained about other workplace misconduct involving inappropriate conduct in and around the company restrooms. Plaintiff was eventually terminated from her employment with Intrepid because she was causing "drama" according to her supervisors.

69. Defendant's acts were in retaliation for plaintiff having engaged in a protected activity, *i.e.*, reporting sexual harassment and an overall hostile work environment.

70. As a result of defendant's actions, plaintiff has suffered stress, anxiety and emotional distress and other intangible damages.

71. Defendant's actions are in violation of Title VII of the Civil Rights Act of 1972, as amended in 1991.

72. Under the circumstances, defendant's actions were willful and malicious, entitling plaintiff to punitive damages.

### COUNT SIX: VIOLATIONS OF THE EQUAL PAY ACT

73. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

74. At all times relevant to this lawsuit, defendant discriminated against plaintiff on the basis of sex by paying plaintiff lower wages than defendant paid/pays to male employees for equal work on jobs the performance of which require equal skill, effort, and responsibility, and which are performed under similar working conditions, in violation of 29 U.S.C. § 206(d), the Equal Pay Act.

75. Pursuant to 29 U.S.C. § 216, plaintiff is entitled to recover the difference between the wages plaintiff was earning and the wages being earned by her male counterparts and an additional equal amount as liquidated damages. Plaintiff is also entitled to recover reasonable attorney's fees and the costs of this action.

76. Defendant's violation of the Equal Pay Act was willful, entitling plaintiff to recover damages for three years before the date that this action was commenced pursuant to 29 U.S.C. § 255(a).

### COUNT SEVEN: AGE DISCRIMINATION

77. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

78. To establish a prima facie case of discrimination under the Age Discrimination in Employment Act ("ADEA:), a plaintiff must allege in her complaint that: (1) she was at least forty years old; (2) she was performing her job satisfactorily; (3) there was an adverse employment action; and (4) she was either replaced by a substantially younger employee with equal or inferior qualifications or discharged under circumstances otherwise giving rise to an inference of age discrimination.

79. Plaintiff has alleged all of the referenced elements of an ADEA complaint. She was 45 years old when she was terminated from her employment with Intrepid. She was satisfactorily performing her job, as is evidenced by consistently high performance grades, and Intrepid's decision to keep plaintiff employed when other employees were laid off during a downturn in the economy as it pertained to oil field related work and services. She was promoted to a position—or at least tasked with performing the job functions of the position—that had previously been performed by a person holding the title of Vice President of Finance. She was later placed under the supervision of a substantially younger accountant who had less experience than the plaintiff, arguably subjected to bullying from the younger accounting supervisor, and eventually terminated altogether. The net effect of her treatment was that Elliott was replaced by a substantially younger employee with equal or inferior qualifications or discharged under circumstances otherwise giving rise to an inference of age discrimination.

80. Intrepid's violation of the ADEA was willful.

81. As the direct result of Intrepid's age discrimination, Elliott has sustained and will continue to sustain wage and benefits losses, and has incurred and will continue to incur out of pocket losses, including attorney fees and legal costs. Intrepid should be ordered to pay Elliott back pay and benefits with interest; reinstate Elliott to her former position with all lost pay and

benefits, seniority and promotions; or in the alternative, Intrepid should be required to pay Elliott front pay and benefits in the event reinstatement is not feasible.

## VII.  JURY DEMAND

82. Plaintiff requests that this matter be tried to a jury.

## VIII.  PRAYER

WHEREFORE, plaintiff prays that defendant be cited to appear and answer and that after final trial hereof, this Court grant judgment in favor of plaintiff and against defendant as follows: (a) that defendant be enjoined from further unlawful conduct as described in this complaint; (b) that plaintiff be reinstated to her employment; (c) that plaintiff be awarded all lost pay and benefits; (d) that, if reinstatement is not feasible, plaintiff be awarded lost wages, front pay, and damages for loss of earning capacity; (e) that plaintiff be awarded an amount equal to the difference between the wages paid to plaintiff and the wages paid to male employees performing equal work, together with interest and an additional equal amount as liquidated damages; (f) that plaintiff be awarded all other compensatory damages to which she may be entitled; (g) that plaintiff be awarded punitive damages; (h) that plaintiff be awarded liquidated damages; (i) that plaintiff be awarded pre-judgment interest; (j) that plaintiff be compensated for the adverse tax consequences of receiving a lump sum award rather than her compensation over several, separate tax years; (k) that plaintiff be awarded reasonable attorney's fees and court costs; and (l) that plaintiff be awarded all other legal and equitable relief to which she may be entitled.

–17–

Respectfully submitted,

/s/ *Daniel W. Lanfear*
Daniel W. Lanfear
State Bar No. 00784443
The Lanfear Law Firm, P.C.
One Energy Plaza
8620 N. New Braunfels, Ste. 215
San Antonio, TX  78217
Tel:  210-824-9230
Fax:  210-824-7911
Dan@lanfearlaw.net

-and-

/s/ *David W. Navarro*
David W. Navarro
State Bar No. 24027683
HORNBERGER FULLER
& GARZA INCORPORATED
The Quarry Heights Building
7373 Broadway, Suite 300
San Antonio, Texas 78209
Tel: 210-271-1700
Fax: 210-271-1740
dnavarro@hfgtx.com

Attorneys for Plaintiff
RHONDA ELLIOTT